# US DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHINTA YOSHIDA, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>AVEX INTERNATIONAL, INC. and AVEX, INC.,<br><br>Defendants. | Civil Action No: 20-cv-3196<br><br>**COMPLAINT FOR:**<br><br>**FRAUD – FALSE PROMISE**<br>**BREACH OF CONTRACT - EMPLOYMENT AGREEMENT**<br>**VIOLATION OF LABOR CODE §970 – FRAUDULENT INDUCEMENT TO RELOCATE**<br>**NEGLIGENT MISREPRESENTATION**<br>**RETALIATION**<br>**BREACH OF CONTRACT – EQUITY AGREEMENT**<br>**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**JURY TRIAL DEMANDED** |

To the Honorable Judges of the United States District Court for the Southern District of New York, Plaintiff, by his attorneys, herein respectfully alleges upon knowledge to himself and upon information and belief as to all other matters as follows:

**I)      PARTIES, JURISDICTION, AND VENUE**

1.      During the majority of times relevant to this Complaint, Plaintiff SHINTA YOSHIDA ("Plaintiff" or "Stevie") was an individual natural person residing, employed in, and providing services in Los Angeles County California and New York to Defendants. Plaintiff currently resides in and is a citizen of Japan.

2.      Defendant AVEX INTERNATIONAL, INC., ("Avex US") was and is, upon information and belief, a Delaware corporation doing business within the State of California and New York and at all times hereinafter mentioned, is an employer whose employees are engaged in commerce with headquarters in New York.

3.      Defendant AVEX, INC., ("Avex Group") was and is, upon information and belief, a Japanese corporation doing business within the State of California and New York.

4.      Upon information and belief, Avex US is either a wholly owned or majority owned subsidiary of Defendant Avex Group.

5.      This Court has jurisdiction due to diversity of citizenship pursuant to 28 U.S.C.A. § 1332.

6.      Venue lies in this district pursuant to 28 U.S.C.A. § 1391, as Plaintiff is informed and believes that the principal places of business of Avex US is in New York.

7.      The amount in controversy exceeds $75,000.

8.      Plaintiff is informed and believes, and thereon alleges, that each of said Defendants are in some manner intentionally, negligently, or otherwise responsible for the acts, occurrences or transactions alleged herein. Plaintiff is informed and believes, and thereon alleges, that each and all of the acts and omissions alleged herein were performed by, or are attributable to, all Defendants, each acting as the agent for the other, with legal authority to act on the other's behalf. The acts of Defendants were in accordance with, and represent the official policy of Defendants.

**PRELIMINARY ALLEGATIONS & STATEMENTS OF FACTS**

9.      Plaintiff ("Stevie"), who is commonly referred to as "Stevie" in the United States and shall be referred to as such throughout this Complaint, initially began working for Avex Group as a general manager in charge of international strategy in December 2013.

10.     Defendant Avex, Inc. ("Avex Group") is an entertainment conglomerate led by founder and CEO Masato Matsuura ("CEO" or "Mr. Matsuura") and headquartered in Tokyo, Japan. Avex (short for audio visual expert) manages J-pop talents like Ayumi Hamasaki and internet sensation PikoTaro. It has also shifted into other business domains like anime, video games and live music events like partnering with Ultra Music Festival and hosting the annual A-nation. Avex Group is publicly traded on the Tokyo Stock Exchange with over 1,000 employees and is the parent holding company of multiple global divisions and subsidiaries, including Defendant Avex US.

11.     Prior to working for Avex Group, Stevie had an extensive educational background with an MBA from MIT and law degree and worked in managerial and corporate business development roles with major companies, such as Walt Disney Company (Japan), Ltd.

12. Stevie was initially contacted to be recruited away from his prior position with Walt Disney by an executive search firm in August 2013 to potentially join Avex Group, which he eventually did on December 1, 2013.

13. Stevie was initially hired by Avex Group as a general manager in charge of global expansion of its video distribution service at a salary of 12,000,000 Japanese Yen and a guaranteed annual bonus of 4,000,000 Japanese Yen.

14. In September 2015, Stevie was promoted to CEO of Avex Asia, which is a wholly-owned Singapore-based subsidiary of Avex Group. In this role, he successfully brought in new licensing contracts and turned Avex Asia around from losing money into being profitable.

15. During his time as Avex Asia, Stevie worked directly with and under the direction of Ryuhei Chiba ("Mr. Chiba"), Avex Group's then Chief Strategy Officer.

16. Mr. Chiba became interested in Stevie's global expansion and business development ideas, not only throughout Asia, but also expansion in the United States.

17. At this point, in January 2015, Mr. Chiba told Stevie that he would be given equity in the US subsidiary that would be formed for that expansion as a form of compensation and incentive to make that new company profitable. Mr. Chiba had initially discussed some form of stock option or other equity, although the specific structure of equity was not discussed at that time other than the promise of up to 40% equity in the new operations.

18. At Mr. Chiba's request, Stevie made a formal presentation to the CEO and executive committee of Avex Group in March 2015 about his ideas to enter into the US market.

19. Avex Group followed Stevie's ideas and plans to implement an entry in the US market and would form the US subsidiary of Avex Group that would pursue that market.

20. Stevie then began preparing to implement the directive to enter the US market.

21. As part of that planning, Stevie met with multiple industry executives and entertainment lawyers to identify a CEO to run the US subsidiary. He eventually narrowed it down to Mr. Richard Blackstone ("Mr. Blackstone") and recommended to Avex Group that they hire Mr. Blackstone to run the US subsidiary as its CEO.

22. In February 2016, Avex Group hired Mr. Blackstone as one of its corporate executives and promoted him to become a member of the board of directors of Avex Group in June 2016.

23. In June 2016, Avex Group formed the US subsidiary Avex International, Inc., a Delaware corporation ("Avex US") and made Mr. Blackstone the CEO of Avex US.

24. At the same time, in June 2016, Avex Group raised Stevie's salary to 14,000,000 Japanese Yen and paid him a bonus of 3,554,964 Japanese Yen.

25. Stevie was again promoted in July 2016 to become one of 17 Corporate Executives for Avex Group, a highly distinguished position, as well as CEO of Avex Asia.

26. Stevie had been working on implementing his plans and in March 2017 he presented his detailed plans, on behalf of Avex US, to Mr. Matsuura and others on the Executive Committee about the implementation of the US strategy for Avex US.

27. During this development of Avex US though Stevie's efforts, Avex US signed Bruno Mars for global music publishing rights, which was a tremendous accomplishment.

28. The projections and plan for Avex US showed tremendous potential growth with projected revenue of several hundred million dollars per year within just a few years of the formation of Avex US.

29. In April 2017, Avex Group, through Mr. Chiba and the board, asked Stevie to relocate and accept a five (5) year assignment to the US to accelerate the business development of Avex US. Stevie accepted the position and entered into the 5-year ("Employment Term") employment agreement with Avex US ("Employment Agreement") as its Senior Vice President, Corporate Strategy.

30. As part of the Employment Agreement entered into in April 2017 and as an inducement to show the potential opportunity for Stevie, Mr. Chiba promised him that up to 40% equity in Avex US would be part of his compensation package ("Equity Grant") to which Stevie agreed ("Equity Agreement").

31. Stevie, relying upon the promises of equity in Avex US, at least a 5-year employment term, and future potential for growth within Avex US, relocated to Los Angeles, California in April 2017.

32. In anticipation of the relocation and long-term position in the US, Stevie married his girlfriend and she moved with him to Los Angeles to start their new life together with their family.

33. Upon his relocation to California, Avex US prepared an application and sponsored Stevie for an E-2 Visa ("Visa Application"). Avex US hired an immigration attorney handle the Visa Application as well.

34. In connection with the Visa Application, Avex US and Avex Group prepared and provided letters to the US Embassy outlining Stevie's achievements and planned assignment in the US for a 5-year period. The letters stated that they "intend to sponsor" Stevie for a "period of five (5) years."

35. In August 2017, Stevie prepared a detailed implementation plan and strategy for Avex US to Avex Group's Executive Committee and Board of Directors to document and obtain formal approval for all that was discussed about Avex US's growth plan.

36. Specifically, on August 9, 2017, the Executive Meeting of Avex Group and Avex US was held where Stevie and the Avex US team made the presentation about the overall plan ("Presentation").

37. The Presentation included on slide 40 entitled "Capitalization Policy – Details" the structure that Stevie was promised that showed up to 40% of ownership of Avex US for its executives and employees to be prepared and finalized by a company named Towers Watson.

38. The next day after the Presentation, on August 10, 2017, the board of directors and top executives for Avex Group and Avex US held a meeting at which the Presentation was approved which resulted in Avex Group approving equity investments of $50 million into Avex US, lines of credit for up to $85 million to Avex US, and formal approval of up to 40% equity in Avex US for the initial founders and executives. Present at that meeting was Mr. Matsuura and the board of directors for Avex Group as well as the initial founders of Avex US, Stevie, Mr. Blackstone, Mr. Chiba, Mr. Boxenbaum, and Mr. Kato.

39. The entire board of directors of Avex Group and Avex US verbally and formally approved the equity grants in the Presentation, which included the Equity Grant promised to Stevie ("Approval").

40. From the time of the Presentation and Approval, Stevie and other executives of Avex US inquired about the formal documentation showing their equity grants and they were told that Towers Watson would be working on that documentation; however, no such plan or documentation were ever provided to the executives promised these equity grants.

41. In fact, in August 2017, Mr. Chiba told Stevie that Mr. Blackstone and Mr. Chiba would be getting 30% of the total equity available for executives of 40% in Avex US, so there would only be 10% equity available for the other founding members; however, there was still no formal documentation provided of this promised equity.

42. At this point, Stevie was getting more concerned about the fact that the Equity Grant kept getting promised but never put in writing. In addition to that, Stevie's salary had been cut in mid-2017 without any justification and his annual bonuses dropped to less than half of what he had received in 2016, before he relocated.

43. Despite Stevie's concerns, he continued excelling at this position with Avex US and always received the highest rating on his performance reviews.

44. Some of his accomplishments were documented in the letters by Avex Group submitted in connection with his pending Visa Application.

45. During 2017 and 2018, Stevie was instrumental in bringing on world-class music catalogues to Avex US and top industry executives, such as the hiring of Mr. Lance Freed as President of Avex US in April 2018.

46. In approximately March 2018, Mr. Chiba asked Stevie to again relocate, this time to New York in order to be closer to Mr. Blackstone, who was working in the company's New York office and to work on New York based projects.

47. As Stevie received continual promises and reassurance from Mr. Chiba that Stevie would be properly compensated and get his Equity Grant, Stevie did move to New York in April 2018.

48. Avex US did agree to pay for Stevie's housing in New York and they entered into a 3 year residential lease in the company's name for Stevie for $9,500 per month.

49. During early to mid-2018, Stevie started hearing that Mr. Chiba may be leaving the company and that Avex Group was looking to sell Avex US.

50. There was talk that Avex US was losing revenue and the value of equity was going down, so Avex Group wanted to get rid of any potential "dissenting" minority shareholders and increase the company's value for a potential sale. This is when the company started trying to eliminate the founding members who were promised equity.

51. In fact, Stevie learned in July 2018 that Avex US was talking with investment bankers or financial consultants who were trying to potentially market the company for sale.

52. The actions to remove any "problem" shareholders continued in mid-2018 when suddenly numerous executives left the company or were transferred back to Japan.

53. Since Stevie had complained to Avex Group and Avex US that discussions by the board and Mr. Matsuura about removing certain executives due to their being too old was not appropriate and would be considered age discrimination in the US, he was targeted for removal (in addition to his being a potential equity holder that they needed to eliminate).

54. Suddenly in June 2018, 3 days after Mr. Chiba suddenly left the company, Stevie (who always received stellar reviews) was told his performance rating would have to be downgraded from SS (highest rating) to B (second to lowest rating), even though his supervisor, Mr. Chiba had already told him it would be SS.

55. Stevie was asked to return to Japan with no explanation and to work in accounting department outside what he has been doing for last 5 years with Avex Group and Avex US. He was not given any specifics about his pay and just told he would have to relocate immediately, or he would be terminated.

56. Any request by Stevie about his Equity Grant were ignored and he was told he was not entitled to anything. Stevie is also informed and believes, and on that basis alleges that all of the founding members and executives of Avex US were promised equity and then eliminated and not given any equity or stock option.

57. Stevie could not suddenly uproot his family and young baby yet again to move back to Japan based upon more false promises and failure of the company to fulfil its obligations for the Employment Term in the US or the Equity Grant promised to Stevie.

58. Stevie was forced to hire an attorney to try to get what he was promised but the response from Avex US, and Avex Group, was to give this long-time successful executive an ultimatum: move back to Japan immediately or be terminated.

59. Stevie was unable to get what he was promised and he was terminated effective October 15, 2018.

60. As of the date of this Complaint, Stevie has not been reimbursed for unpaid wages, relocation expenses, bonuses, retirement, and other amounts that he was entitled to.

61. As of September 2018, Stevie's Visa Application is ready for approval but it needs an employment verification letter from Avex US, which he obviously can't obtain now.

62. Upon his termination, the company wasted no time and immediately terminated his family's health benefits without warning on his termination date. Stevie hadn't even received a COBRA notice when his family was denied medical treatment because their insurance was cancelled. He couldn't even apply for new coverage until he had the COBRA notice, so the company left him without coverage.

63. Avex US then immediately sent notice of termination of his residential lease and of the company's intent to immediately begin eviction proceedings unless he immediately started paying the $9,500 per month lease.

64. Stevie, his wife, and infant child are stuck in New York, about to be evicted, about to have their Visa Application denied, and without the job he was promised for the Employment Term or the Equity Grant.

65. To add insult to injury, Avex Group (which also apply to Avex US) has written Regulations for Overseas Assignment ("Overseas Regulations") that supposedly govern the handling of compensation and other working conditions for employees who have been assigned to work at an overseas office for any of the Avex Group's companies. All the actions taken against Stevie not only violate the law, they also violate the Overseas Regulations that the Defendants profess to follow.

66. The Overseas Regulations have strict limitations on when overseas work may be cancelled and no such reason existed in Stevie's case.

67. The Overseas Regulations provide for travel expenses, costs of living assistance, and moving expense, which the Defendants have failed to pay or reimburse Stevie for.

68. The Overseas Regulations provide for adjustments in currency when calculating base pay and bonuses (that were to remain consistent with work done in Japan). Stevie did not receive the benefit of any of such adjustments and his bonuses were more than half of what he previously made before he moved to the US.

69. As a result of the actions of the Defendants, Stevie has lost wages, lost bonuses, lost the Equity Grant worth millions, lost his place to live, and lost his right to be in the US. Stevie has also not been reimbursed for expenses, relocation, retirement benefits, accrued vacation, and many other forms of compensation.

## FIRST CLAIM FOR RELIEF

## FRAUD - FALSE PROMISE

### (Against all Defendants)

70. The Plaintiff realleges and incorporates by reference all prior allegations contained in this Complaint.

71. As outlined above, Defendant, though its representative Mr. Chiba and Avex Group and Avex US's board of directors, represented (including at the board meeting on August 10, 2017 and Mr. Chiba's statements in January 2015 and continuing) to Plaintiff that he would be given a large portion of equity, in the form of the Equity Grant, and employed for a 5-year Employment Term in the US. They promised Plaintiff equity and long-term employment to induce him to relocate first to California and then again to New York.

72. These representations were material to Plaintiff as he saw significant value in the Equity Grant and relocation to the US.

73. The Defendants never intended to comply with the promises of the Equity Grant or Employment Term and any attempts to formalize the Equity Grant were pushed aside.

74. The Defendants intended to get Plaintiff to rely on these promises as they saw value in his work and past success but had no plan to honor their promises.

75. Plaintiff did reasonably rely on these promises and moved to the US, specifically to California, moving his entire family there, and then again to New York at the request of Defendants.

76. Defendants failed to honor their promises for the Employment Term or the Equity Grant.

77. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered significant monetary damages.

78. As a further direct and proximate result of Defendants' wrongful conduct, Plaintiff is entitled to injunctive relief to remedy the failure to provide the Equity Grant by Defendant as a result of Defendants' fraudulent, unfair and unlawful business practices to prevent Defendants from being unjustly enriched by keeping this equity.

79. California Civil Code § 3294(a) provides, in pertinent part: In an action for the breach of an obligation not arising from agreement, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

80. Defendants acted with fraud, malice and/or oppression in carrying out the above described scheme. Defendants fraudulently sought to avoid paying Plaintiff millions of dollars in promised compensation in the form of the Equity Grant and, based upon information and belief, did this to get a larger profit from a potential sale of Avex US. Plaintiff is therefore entitled to punitive damages against Defendants.

## SECOND CLAIM FOR RELIEF

## BREACH OF CONTRACT – EMPLOYMENT AGREEMENT

### (Against all Defendants)

81. The Plaintiff realleges and incorporates by reference all prior allegations contained in this Complaint.

82. Plaintiff and Defendants entered into the Employment Agreement.

83. Plaintiff performed everything he was required to do under the Employment Agreement.

84. Defendants' performance was due to continue the Plaintiff's 5-year Employment Term and provide all forms of compensation he was entitled to under the Employment Agreement and Overseas Regulations.

85. Defendants failed to perform and had no excuse for non-performance as there was no Good Cause or other reason for early termination of the Employment Term.

86. In addition to the breach of Employment Agreement for the 5-year term, Defendants' early termination of Plaintiff breached its own Overseas Regulations that governed the employment relationship as outlined above.

87. Based on Defendants' conduct described in this Complaint, Defendants also waived its right and/or is estopped to deny such obligations and breaches.

88. As a result of the Defendants' breaches, Plaintiff has suffered damages as a result of the loss of the Employment Term and resulting salary and benefits.

89. As a further result of Defendants' breaches, Plaintiff is entitled to injunctive relief to remedy such unlawful continuing conduct, and to an order requiring that Defendant specifically perform the Employment Agreement by re-instating the agreed five-year Employment Term.

90. As a further result of Defendants' failure to pay amounts due under Overseas Regulations (in breach of the Employment Agreement which incorporated such rules as part of the Employment Agreement), Plaintiff was further damaged from not receiving the benefits of such Overseas Regulations.

### THIRD CLAIM FOR RELIEF

### VIOLATION OF CA LABOR CODE §970 – FRAUDULENT INDUCEMENT TO RELOCATE

**(Against all Defendants)**

91. The Plaintiff realleges and incorporates by reference all prior allegations contained in this Complaint.

92. California Labor Code § 970 provides, in pertinent part: "No person, or agent or officer thereof, directly or indirectly, shall influence, persuade, or engage any person to change from one place to another in this State or from any place outside to any place within the State, or from any place within the State to any place outside, for the purpose of working in any branch of labor, through or by means of knowingly false representations, whether spoken, written, or advertised in printed form, concerning . . . (b) The length of time such work will last, or the compensation therefor."

93. Defendants used knowingly false representations contained in the Employment Agreement and Equity Grant to influence, persuade or engage Plaintiff to accept employment with Defendants and thereby change from any place outside of California (i.e. Asia) to any place within California or from any place outside to any place within the State of California.

94. Specifically, Defendants represented to Plaintiff in his Employment Agreement and Equity Grant that he would get up to 10% equity in Avex US and continual employment for at least the 5-year Employment Term in order to get Plaintiff to move into California and then again out of California to New York. Defendants made such representations to Plaintiff without the intent to perform them.

95. Plaintiff justifiably relied upon such misrepresentations by relocating his residence from Asia to California to accept employment with Defendants and then again to New York.

96. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages. The aforementioned conduct of Defendants was an intentional misrepresentation, deceit or concealment of a material fact known to Defendants. In engaging in this conduct, Defendants acted oppressively, maliciously, fraudulently, and/or outrageously toward Plaintiff, with conscious disregard for his known rights and with the intention of causing, and/or willfully disregarding the probability of causing, unjust and cruel hardship to Plaintiff in so acting, these Defendants intended to and did vex, injure and annoy Plaintiff. Therefore, an assessment of punitive damages should be made against these Defendants, and each of them, in an amount sufficient to punish these Defendants and to prevent these defendants from willfully engaging in future conduct as herein described above.

97. California Labor Code §972 provides that: "In addition to such criminal penalty, any person, or agent or officer thereof who violates any provision of section 970 is liable to the party

aggrieved, in a civil action, for double damages resulting from such misrepresentations." Plaintiff is therefore also entitled to double damages resulting from such misrepresentations.

## FOURTH CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION

### (Against all Defendants)

98. The Plaintiff realleges and incorporates by reference all prior allegations contained in this Complaint.

99. Defendants made untrue representations regarding material facts contained hereinabove and in the Employment Agreement and Equity Grant. Defendants promised Plaintiff that he would have a 5-year Employment Term in the US. Defendants promised to reimburse Plaintiff for his relocation expenses and other compensation. Defendants promised Plaintiff he would get the Equity Grant worth millions. Defendants had no reason to believe that the representations made to Plaintiff were true. Every representation made to Plaintiff was made in the course of Defendants' business.

100. At all times Defendants were hoping to grow and sell the business, which would have ultimately left Plaintiff without employment. Defendants strung Plaintiff along in order to increase the value of Avex US through his efforts. At all times, Defendants never intended on fulfilling their promises of the Equity Grant or Employment Term. Within a 2 year period, Defendants convinced Plaintiff to uproot his family to move to California, then to New York, and then asked him to do so again to move back to Japan without warning. By doing so, Defendants made material misrepresentation for which Plaintiff relied. As a result of the material misrepresentations made by Defendants, and each of them, Plaintiff has suffered significant damages.

101. Defendants made false representations with the intention to induce Plaintiff to rely on these representations.

102. At the time these false representations were made, Plaintiff was ignorant of the falsity of Defendants' representations and believed them to be true. In reliance thereon, Plaintiff was induced to and did give up his existing position at Avex Asia, incurred traveling expenses, relocation

expenses, reduced salary and bonuses in order to move to the US. It was not until the middle of 2018, that Plaintiff became aware that Defendants had misrepresented their true intentions.

103. Defendants forced Plaintiff to suffer significant damages. Had Plaintiff known the actual facts, he would not have relocated to the US. Plaintiff's reliance on Defendants' representations were justified because Defendants retained and paid for the immigration attorney to secure Plaintiff's Visa Application, helped Plaintiff find suitable housing, and Defendants' top executives continued in their promises of the Equity Grant. Plaintiff sustained damages from the failure to keep the Employment Term in over $1,000,000 in salary and housing benefits alone for the remainder of the Employment Term.

104. As a cause of the material misrepresentations, Plaintiff was deprived of wages, equity ownership, bonuses, vacation time, and a car allowance under the Employment Agreement and Overseas Regulations.

105. Defendants acted with fraud, malice and/or oppression in carrying out the above described scheme. Defendants fraudulently sought to avoid paying Plaintiff millions of dollars in promised compensation and, upon information and belief, also took millions of dollars in potential equity underlying the Equity Grant from Plaintiff. Plaintiff is therefore entitled to punitive damages against the Defendants.

## FIFTH CLAIM FOR RELIEF

### RETALIATION

**(Against all Defendants)**

106. The Plaintiff realleges and incorporates by reference all prior allegations contained in this Complaint.

107. At all times during his employment with Defendants, Plaintiff performed his duties with the utmost diligence and competence.

108. Defendants were Plaintiff's employers within the meaning of the law. Plaintiff complained to Defendants about the mistreatment based on age of the Defendants' executives. In response, Plaintiff was subjected to demotion and eventual wrongful termination, all with the

knowledge and approval of Defendants for the purpose of punishing him for attempting to assert his rights and opposing the unlawful age discrimination of the Defendants.

109. Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

110. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered adverse employment consequences as he was initially demoted and then terminated. The Plaintiff's attempt to report and oppose the unlawful age discrimination by Defendants was the substantial motivating factor in Plaintiff suffering adverse employment consequences. Plaintiff was always praised for his work and there was no other reasonable basis for his sudden negative reviews, demotion, and termination. Plaintiff was caused to suffer lost past and future wages, professional opportunities, other valuable benefits and emoluments of employment as well as to endure severe emotional pain and trauma, all to his detriment.

111. As a result of Defendants' abovementioned acts and omissions, Defendants are in violation of the fundamental public policies of the State of California, the State of New York, and the City of New York, as set forth in Government Code Section 12940 and the California Constitution Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 et. seq., and N.Y.C Admin. Code §§ 8-101 *et seq. and* §8-502, which require employees be free from unlawful discrimination, harassment, and retaliation.

112. Plaintiff is informed and believes, and herein alleges, that Defendants committed the acts maliciously, intentionally, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper motive amounting to malice, with conscious disregard for Plaintiff's rights. Due to these acts and omissions being carried out by managerial employees of Defendants, acting in a deliberate, unacceptable, and despicable manner in order to injure and damage Plaintiff, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be ascertained at trial.

## SIXTH CLAIM FOR RELIEF

**BREACH OF CONTRACT – EQUITY AGREEMENT**

**(Against all Defendants)**

113. The Plaintiff realleges and incorporates by reference all prior allegations contained in this Complaint.

114. Plaintiff and Defendants entered into the Equity Agreement representing the Equity Grant.

115. Plaintiff performed everything he was required to do under the Equity Agreement by continuing to work for the Defendants and perform his duties.

116. Defendants' performance for providing the Equity Grant under the Equity Agreement was due.

117. Defendants failed to perform and had no excuse for non-performance of the Equity Agreement.

118. Based on Defendants' conduct described in this Complaint, Defendant also waived its right and/or is estopped to deny such obligations and breaches.

119. As a result of the Defendants' breaches, Plaintiff has suffered damages as a result of the failure to obtain any of the promised Equity Grant, which Plaintiff relied upon as part of his compensation.

120. As a further result of Defendants' breaches, Plaintiff is entitled to injunctive relief to remedy such unlawful continuing conduct, and to an order requiring that Defendants specifically perform the Equity Agreements by issuing the Equity Grant to Plaintiff.

## SEVENTH CLAIM FOR RELIEF

### BREACH OF COVENANT OF GOOD FAITH & FAIR DEALING

### (Against all Defendants)

121. The Plaintiff realleges and incorporates by reference all prior allegations contained in this Complaint.

122. The covenant of good faith and fair dealing is implied in all contracts in order to protect the express covenants or promises of the contract.

123. Said covenant obligated Defendants to perform all the terms and conditions of the Employment Agreement and Equity Agreement fairly and in good faith and to refrain from doing any act, which could prevent or impede Plaintiff from performing any or all of the conditions of those

agreements that he agreed to perform or any act that would deprive Plaintiff of the benefits of such agreements.

124. Plaintiff was prevented by Defendants from dutifully performing all of the duties and conditions of the Employment Agreement and/or Equity Agreement.

125. Defendants knew that Plaintiff had relied on the material representations by Defendants and began to fulfill his obligations and duties pursuant to the Employment Agreement. Defendants further knew that they were going to sell their business or otherwise had no intention of providing Plaintiff with any of his Equity Grant, yet continued to misrepresent the terms and conditions of Plaintiff's employment. Most egregious, is that Defendants waited until just before Plaintiff was to finalize his immigration visa and had already moved his family from California and then New York, even though the Defendants had the knowledge that Plaintiff has relied on the representations to his profound detriment.

126. As a cause of said Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered and continues to suffer loss of earnings and other employment benefits, all to his damage in an amount to be proven at the time of trial.

## PRAYER

**WHEREFORE**, Plaintiff prays for judgment against all Defendants, jointly and severally, as follows on all causes of action, or any individual cause of action, in the alternative:

### On the First Cause of Action

1. For special damages, including but not limited to, lost earnings, benefits, and out-of-pocket expenses, all in an amount set forth above and/or according to proof at the time of trial;

2. For further special damages, including but not limited to, lost future earnings, benefits and other prospective damages in an amount set forth above and/or according to proof at the time of trial;

3. For general damages in an amount set forth above and/or according to proof at the time of trial; and

4. For punitive and exemplary damages in an amount according to proof at the time of trial.

### On the Second Cause of Action

1. For general unpaid wages, bonuses, equity, and such general and special damages as may be appropriate under the Employment Agreement;

**2.** For pre-judgment interest on any unpaid wages and general damages from the date such amounts were due; and

**3.** For all actual, consequential, and incidental losses and damages, according to proof.

### On the Third Cause of Action

1. For special damages, including but not limited to, lost earnings, benefits, and out-of-pocket expenses, all in an amount set forth above and/or according to proof at the time of trial;

2. For further special damages, including but not limited to, lost future earnings, benefits and other prospective damages in an amount set forth above and/or according to proof at the time of trial;

3. For general damages in an amount set forth above and/or according to proof at the time of trial;

4. For punitive and exemplary damages in an amount according to proof at the time of trial; and

5. For statutory penalties, double damages, pursuant to California Labor Code § 972.

### On the Fourth Cause of Action

1. For special damages, including but not limited to, lost earnings, benefits, and out-of-pocket expenses, all in an amount set forth above and/or according to proof at the time of trial;

2. For further special damages, including but not limited to, lost future earnings, benefits and other prospective damages in an amount set forth above and/or according to proof at the time of trial;

3. For general damages in an amount set forth above and/or according to proof at the time of trial; and

4. For punitive and exemplary damages in an amount according to proof at the time of trial.

### On the Fifth Cause of Action

1. For special damages, including but not limited to, lost earnings, benefits, and out-of-pocket expenses, all in an amount set forth above and/or according to proof at the time of trial;

2. For further special damages, including but not limited to, lost future earnings, benefits and other prospective damages in an amount set forth above and/or according to proof at the time of trial;

3. For general damages in an amount set forth above and/or according to proof at the time of trial; and

4. For punitive and exemplary damages in an amount according to proof at the time of trial.

### On the Sixth Cause of Action

1 For general unpaid wages, bonuses, equity, and such general and special damages as may be appropriately contained in the Equity Agreement.

2 For pre-judgment interest on any unpaid wages and general damages from the date such amounts were due; and

3 For all actual, consequential, and incidental losses and damages, according to proof.

### On the Seventh Cause of Action

1. For special damages, including but not limited to, lost earnings, benefits, and out-of-pocket expenses, all in an amount set forth above and/or according to proof at the time of trial;

2. For further special damages, including but not limited to, lost future earnings, benefits and other prospective damages in an amount set forth above and/or according to proof at the time of trial;

3. For general damages in an amount set forth above and/or according to proof at the time of trial; and

4. For punitive and exemplary damages in an amount according to proof at the time of trial.

### On All Causes of Action

1. For declaratory relief stating that Plaintiff is entitled to the equity promised in the Equity Contract and injunctive relief to order Defendants to issue the Equity Grant;

    2.       For Plaintiff's costs of suit;

    3.       For Plaintiff's attorney's fees in an amount determined by the Court to be reasonable according to proof, if applicable; and

    4.       For any other relief the Court considers proper.

.

Dated:   April 21, 2020

                                                VIRGINIA & AMBINDER, LLP

By:       /s/ Kara Miller
      Kara Miller, Esq.
      40 Broad Street, Seventh Floor
      New York, New York 10004
      Tel:   (212) 943-9080
      Fax:  (212) 943-9082
      kmiller@vandallp.com

      COHEN IP LAW GROUP, P.C.
      Christopher Barsness, Esq. *
      9025 Wilshire Blvd., Suite 301
      Beverly Hills, California 90211
      Tel: (310) 288-4500
      Fax: (310) 246-9980
      cbarsness@cohenip.com

      *seeking admission *pro hac vice*